604 F.2d 42
 UNITED STATES of America, Plaintiff-Appellant,
v.
CITY OF McALESTER, OKLAHOMA, a/k/a City of South McAlester,
Oklahoma, Charley Chiusana, J. T. Hall, a/k/a Joe Turner
Hall, Jim Burrows, Earnest Berry, Phillip Orlandees, Joe
Whitefield, Don Ketcham, Bill Lyons, and Unknown Lessees,
Licensees, and Permittees, Defendants-Appellees.
 No. 76-1455.
 United States Court of Appeals,
Tenth Circuit.
 Argued Aug. 9, 1978.
Decided Aug. 14, 1979.
 
 Maryann Walsh, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Washington, D. C., Richard A. Pyle, U. S. Atty., Muskogee, Okl., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., on the brief), for plaintiff-appellant.
 Donald R. Hackler, City Atty., McAlester, Okl., for defendants-appellees.
 Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY and LOGAN, Circuit Judges, sitting en banc.
 HOLLOWAY, Circuit Judge.
 
 
 1
 The United States appeals from a judgment of the United States District Court for the Eastern District of Oklahoma, 410 F.Supp. 848, holding valid an easement for a municipal waterworks obtained by the City of McAlester over lands owned by the Choctaw and Chickasaw Nations (the Nations), and denying declaratory and injunctive relief.
 
 
 2
 At the request of the Secretary of the Interior the United States brought this action in its own right[1] and in its fiduciary capacity[2] on behalf of the Choctaw and Chickasaw Nations against the City of McAlester, a/k/a City of South McAlester (McAlester), and other named and unnamed defendants. The United States sought: (1) a judicial determination that an easement over 2,535.8 acres of tribal lands for the purpose of a watershed, basin, and waterworks system obtained by McAlester on January 31, 1903, was invalid; (2) to quiet title in the Choctaw and Chickasaw Nations to the tribal lands in question; (3) an injunction against McAlester preventing it from issuing permits, leases, licenses, and otherwise using the tribal lands without authority; and (4) damages for unauthorized use of the lands. The trial court held that the easement for the waterworks was valid and all relief sought by the Government was denied. The Government appealed.
 
 
 3
 An earlier opinion of a panel of this court reversed the trial court's judgment and held that the Curtis Act, 30 Stat. 495, a special 1898 statute dealing with the Five Civilized Tribes, did not authorize condemnation of the easement over the unallotted tribal lands in question; that the Government was an indispensable party which had not been joined in the 1903 proceeding; and that therefore the 1903 judgment was void. We decided to reconsider these important questions En banc.
 
 
 4
 * THE 1903 CONDEMNATION SUIT AND THE TRIAL COURT'S RULING OF
 
 VALIDITY OF THE EASEMENT
 
 5
 On January 31, 1903, condemnation proceedings which gave rise to the easement in question took place in the Central District of the United States Court in the Indian Territory. The Nations in that case, number 3293, styled City of South McAlester v. The Choctaw and Chickasaw Nations of Tribes of Indians, stipulated that the value of all the lands sought to be condemned by the City[3] was in accordance with the appraisal of the Dawes Commission, and that the Commission's appraisal of $6,515.00 was fair and reasonable compensation for the easement to be taken. They also waived any right of appeal from the judgment to be entered on a jury verdict in accordance with the stipulation.
 
 
 6
 The jury in that action returned a verdict in favor of McAlester, awarding $6,515.00 in compensation to the Nations. The court entered judgment granting McAlester an easement over 2,535.8 acres for (II R. 117):
 
 
 7
 the purpose of a watershed and basin and erecting, maintaining and using a water-works system for said plaintiff, the City of South McAlester, to have and to hold and possess said easement so long as the same shall be used for the purposes heretofore set out.
 
 
 8
 There was testimony at trial that the primary use of the watershed easement acquired from the Choctaw and Chickasaw Nations is to serve as the primary water supply source for the City of McAlester. Two lakes, a filtration plant and the main transmission line from the plant to the City are located on the watershed. (I R. 13-14).
 
 
 9
 In 1950 the Nations brought a suit against the City to quiet title to the 2,535.8 acres in question in the United States District Court for the Eastern District of Oklahoma. In 1951 the Choctaw Nation moved to join the United States as a party defendant. After an order for such joinder, the Government moved to dismiss on the ground that it had not consented to be sued. That action was dismissed as to the United States on this ground and judgment was entered between the original parties determining that the Nations were the owners of fee simple title to the lands, subject to the easement of the City for the purposes of a watershed and basin so long as they were used for such purposes.[4]
 
 
 10
 As noted, the instant suit was brought in 1975 by the Government on behalf of the Nations to quiet title to the lands in question against claims by the City, to declare the easement invalid, and for injunctive relief and damages for unauthorized uses of the lands. The trial court ruled that the United States was an indispensable party to the 1903 condemnation action and that the Government had met its burden of proving its absence from that proceeding. 410 F.Supp. at 854. Nevertheless, the court held that the condemnation was authorized by 25 U.S.C. Sec. 357 (permitting condemnation of allotted lands), and that even if the Government had been a party it could not have prevented the condemnation.
 
 
 11
 The court also found that none of the uses of the lands challenged by the Nations is inconsistent with the primary purpose of the easement to serve as a watershed and basin. The court held that the Nations are owners of fee simple title to the lands in question, subject only to the City's easement for the purpose of a watershed and basin and for erecting, maintaining and using a waterworks system so long as the easement is used for such purpose.
 
 
 12
 The Government's appeal presents three principal issues: (1) whether the Government was an indispensable party to the 1903 condemnation suit in which it was not joined; (2) whether the Curtis Act authorized the condemnation of the tribal lands involved; and (3) whether the City has made improper uses of the land for non-watershed purposes.
 
 II
 
 13
 THE QUESTIONS OF INDISPENSABILITY OF THE UNITED STATES TO
 
 THE 1903 CONDEMNATION AND OF CONGRESSIONAL
 AUTHORIZATION OF THE PROCEEDING
 
 14
 * In the trial court the parties agreed, and the court found, that the United States was an indispensable party to the 1903 condemnation suit and that the Government was not made a party to that proceeding.[5] However on appeal the Government says that our first question is "(w)hether the City could condemn unallotted tribal land without joining the United States as an indispensable party." (Brief for the United States, 2). Proposition I of the Government's argument is that the trial court erred in holding that the City could condemn unallotted tribal land without joining the United States, an indispensable party. (Id. at 6). Since the issue is fundamental to the power of the court to enter a valid condemnation judgment, see United States v. Candelaria, 271 U.S. 432, 443, 46 S.Ct. 561, 70 L.Ed. 1023, we turn first to the indispensability issue.[6]
 
 
 15
 As mentioned, the trial judge was of the view that the easement is valid despite failure to join the Government as a party. The reasoning was essentially that the Government could not have challenged the City's right to acquire the easement, that the Government is not questioning the fairness of compensation paid, and that an actual taking did occur in the proceedings. 410 F.Supp. at 854-55. We are unable to agree with this disposition of the indispensability issue. If, as the Government argues, the Indians lands in question remained subject to a restraint on alienation, and the condemnation was unauthorized, the lands could not "be alienated in any wise without (the Government's) consent . . . " United States v. Candelaria, 271 U.S. 432, 443, 46 S.Ct. 561, 563, 70 L.Ed. 1023, and the Government would be an indispensable party. See also Minnesota v. United States, 305 U.S. 382, 386-87, 59 S.Ct. 292, 83 L.Ed. 235. We cannot be sure what the effect of the Government's participation in the condemnation case might have been. In any event, the fundamental question is whether an indispensable party was not joined whose interest could not be affected without its presence. United States v. Candelaria, supra, 271 U.S. at 443-44, 46 S.Ct. 561.
 
 
 16
 The indispensability of the Government as a party in suits alienating Indian lands is an important feature of the Government's special relationship to the Indians which "resembles that of a ward to his guardian." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25; Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483. Restraints on alienation have been implied from the guardianship and have also been made express in some cases by treaty and statute. Being convinced, however, that such restraints and conditions for approval of alienation had been removed by Congress as to these particular Indian lands before the 1903 condemnation suit, and that the Congress consented to the condemnation, we must conclude that the United States was not an indispensable party to the condemnation proceeding in question.
 
 
 17
 The decisions relied on by the Government demonstrate that the presence of restraints on alienation of Indian lands or requirements for approval of their alienation has been the basis of holdings that the Government is an indispensable party. In Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235, the land in question was held by individual Chippewa Indians. The patents were subjected to a 25-year restraint on alienation, extended by later acts of Congress.[7] The Court premised its holding of indispensability on the presence of the restraint on alienation, stating that "(a)s the parcels here in question were restricted lands, the interest of the United States continues throughout the condemnation proceedings." Id. at 388, 59 S.Ct. at 295.
 
 
 18
 Similarly in United States v. Hellard, 322 U.S 363, 64 S.Ct. 985, 88 L.Ed. 1326, the allotment in question was that of a full-blood Creek Indian which was subject to a restraint on alienation not lifted by the 1918 Act granting Oklahoma courts jurisdiction over partition proceedings. 40 Stat. 606, 25 U.S.C. Sec. 355; See 322 U.S. at 366, 64 S.Ct. 985. The Court referred to the Government's interest as guardian and held that the Government was an indispensable party to the partition suit in question, stating that "(r) estricted Indian land is property in which the United States has an interest . . . Under § 2 of the Act of June 14, 1918 lands partitioned in kind to full-bloods remain restricted. Only if the land is sold at partition sale are the restrictions removed. The governmental interest throughout the partition proceedings is as clear as it would be if the fee were in the United States . . . " Id. at 366, 64 S.Ct. at 987.
 
 
 19
 Other cases relied on lead to the same conclusion: the Government is an indispensable party to suits involving alienation of Indian lands where there are restraints on alienation and continuing requirements for approval of conveyances, demonstrating the interest of the United States as guardian.[8] In Town of Okemah v. United States, 140 F.2d 963, 964, this court pointed to a continuing restraint on alienation of the allotted Creek lands in question and Judge Phillips stated that:
 
 
 20
 The United States is an indispensable party to any action wherein the relief sought would impair its governmental function to protect the allotted lands against alienation.
 
 
 21
 Thus, for our purposes the question of the indispensability of the United States as a party to the 1903 proceeding turns on whether restraints on alienation by the Choctaw and Chickasaw Nations of these tribal lands remained at that time and whether congressional consent to the condemnation was given. We turn to an analysis of the controlling statutes and treaties and to the 1834 Non-Intercourse Act and the 1842 patent upon which the Government relies.
 
 B
 
 22
 In addition to relying on the restraint in the 1842 patent, the Government says that the taking of the easement was a conveyance of tribal land in contravention of the following portion of the Non-Intercourse Act appearing in 25 U.S.C. Sec. 177 (Brief for the United States, 11):
 
 
 23
 No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.[9]
 
 
 24
 This statutory policy has been significantly modified. In 1871 Congress determined that the United States would no longer deal with the Indians by means of the formal treaty-making process. See Indian Appropriation Act of March 3, 1871, 16 Stat. 544, 566, codified at 25 U.S.C. Sec. 71 (1976). This change of policy was noted in Lone Wolf v. Hitchcock, 187 U.S. 553, 565-67, 23 S.Ct. 216, 47 L.Ed. 299, and Stephens v. Cherokee Nation, 174 U.S. 445, 483-84, 19 S.Ct. 722, 43 L.Ed. 1041, which state that by exercising its plenary power over Indian affairs Congress may override treaty provisions and legislate for the protection of the Indians.
 
 
 25
 At the outset, it is important to note that prior to 1903 the lands in question were jointly owned in fee by the Choctaw and Chickasaw Nations, subject to a reversionary interest in the United States upon extinguishment of the tribes as nations or their ceasing to live upon the lands,[10] Mills, Oklahoma Indian Land Laws Sec. 56 (2d ed. 1924), and subject to a restraint in the 1842 patent conveying the lands that they shall not be "liable to transfer or alienation except to the United States or with their consent." (See Brief for the United States, 3).[11] The Choctaw Nation acquired rights in these lands by virtue of the Treaty at Dancing Rabbit Creek, September 27, 1830, 7 Stat. 333, and a subsequent patent of March 23, 1842. The Chickasaw Nation obtained an interest in the same lands pursuant to the Treaty of January 17, 1837, 11 Stat. 573, and the Treaty of June 22, 1855, 11 Stat. 611. See e. g., Choctaw Nation v. Oklahoma, 397 U.S. 620, 625-27, 90 S.Ct. 1328, 25 L.Ed.2d 615.
 
 
 26
 These earlier treaties were confirmed by the Treaty with the Choctaws and Chickasaws of 1866, 14 Stat. 765. The Congress then, in the 1890's, determined on a policy to open up the lands of the Five Civilized Tribes to settlement by non-Indians. See Harjo v. Kleppe, 420 F.Supp. 1110, 1121 (D.D.C.); See also Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941. The Dawes Commission provisions of 1893, 27 Stat. 612, 645, created the Commission to the Five Civilized Tribes to negotiate the relinquishment of tribal title to lands by cession to the United States or by allotment to members of the tribes. See Wallace v. Adams, 204 U.S. 415, 27 S.Ct. 363, 51 L.Ed. 547. Significantly for our purposes, the Act granted the "Consent of the United States . . . To the allotment of lands in severalty." 27 Stat. 612, 645. While this particular consent to allotment is not involved, it is significant because it demonstrates congressional willingness to grant a general legislative consent to conveyances by the Five Civilized Tribes of their lands, without further governmental approval. Likewise, as noted in the House Report accompanying the Curtis Bill, the "(c)onsent of the United States is given to the tribes to convey by deed to any city or town the lands embraced within the limits of said corporation and provide the disposition of the lands so purchased." H.Rep. No. 593, 55th Cong. 2d Sess. at 3 (1898); See Curtis Act Sec. 15, 30 Stat. at 501.
 
 
 27
 The negotiations which followed produced the Atoka Agreement of April 23, 1897, executed by the Dawes Commission and the Choctaws and Chickasaws. That agreement,[12] ratified by and incorporated into Section 29 of the Curtis Act of 1898, c. 517, 30 Stat. 495, 505-13, gave the consent of the United States for the alienation of the tribal lands of the Nations.[13]
 
 
 28
 Specifically Sec. 11 of the Curtis Act[14] granted the consent of the United States to condemnation proceedings by municipalities for public improvements. It provided as follows (30 Stat. at 498):
 
 
 29
 That all towns and cities heretofore incorporated or incorporated under the provisions of this Act are hereby authorized to secure, by condemnation or otherwise, all the lands actually necessary for public improvements, regardless of tribal lines; and when the same cannot be secured otherwise than by condemnation, then the same may be acquired as provided in sections nine hundred and seven and nine hundred and twelve, inclusive, of Mansfield's Digest of the Statutes of Arkansas.
 
 
 30
 This consent of the United States in the Curtis Act to acquisition or condemnation by cities and towns of lands necessary for public improvements distinguishes this case from Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 382, 83 L.Ed.2d 235. There the condemnation was of individual allotted Chippewa parcels which were subject to restraints on alienation imposed by the General Allotment Act of 1887 and extended by legislation subsequent to the statute authorizing condemnation. Id. at 387-88, 59 S.Ct. 382. On the other hand the Curtis Act, considered together with the Dawes Commission provisions and the agreements cited, authorized conveyances by the Choctaw and Chickasaw Nations to allottees, freedmen, purchasers of town lots and to municipalities by voluntary conveyances or condemnation for public improvements. And while some of these conveyances required other governmental approval at a preliminary stage, no such approval beyond the consent given in Sec. 11 was required in connection with such condemnations or voluntary conveyances to cities and towns for public improvements.[15]
 
 
 31
 In addition, we note in particular that in Sec. 2 of the Curtis Act, a specific provision required making the tribe a party to any suit affecting its property.[16] The Congress was thus astute to make requirements for necessary parties where desired, but the United States was not so designated in Sec. 11 which specified the procedures for such condemnation by reference to the Arkansas statutes.
 
 
 32
 The Curtis Act, a comprehensive and special statute governing matters in the Indian Territory for the Five Civilized Tribes, controls over the general provisions of the 1834 Non-Intercourse Act, 25 U.S.C. Sec. 177, relied on by the Government. That special act removed existing restraints on alienation and authorized the judicial condemnation without any condition for further governmental participation beyond that of the United States Court for the Territory in accordance with the statutory procedures designated by Congress.[17] We are also convinced that this special, subsequent legislative consent to municipal condemnations in the Indian Territory removed the restraint of the 1842 patent in that such condemnations were "with (the) consent" of the United States in the terms of the restraint. (See discussion of the patent restraint, Supra p. 13 and note 9).
 
 
 33
 We are mindful of the fiduciary duty of the Government to the Indian tribesand of the general view that the United States is a necessary party to proceedings where restricted Indian land is alienated by judicial decree. See United States v. Hellard, 322 U.S. 363, 366-68, 64 S.Ct. 985, 88 L.Ed. 1326. However, we must also consider the language, nature and purpose of the special statute and agreements dealing with the disposition of these tribal lands in the Indian Territory. Id. at 365-66, 64 S.Ct. 985. In light of these provisions and the legislative consent for such condemnation proceedings, without further governmental participation, it may be reasonably inferred that the governmental interests were protected by means other than joining the United States as a party. United States v. Hellard, supra, at 365-66, 368, 64 S.Ct. 985. It follows that the United States was not an indispensable party to the condemnation proceedings.
 
 
 34
 The Government argues, however, that the authorization in Sec. 11 of the Curtis Act for condemnation applied only to allotted, and not to unallotted tribal lands which are involved here, as the panel opinion held. (Government's Response to Petition for Rehearing, 1-2, 4; Government's Supplemental Memorandum on Rehearing, 2-7). It has been argued that the condemnation provision appears in Sec. 11 which is said to deal exclusively with the allotment of Indian lands by the Dawes Commission; that the historical background of the legislation shows that its purpose was to compel allotment; that if Congress had intended to provide for condemnation of all Indian lands allotted and unallotted it would have included a broad provision therefor as a separate section of the Curtis Act; and that if unsupervised broad condemnation of all Indian lands had been provided for, there would have been a serious question of breach of the Government's trust relationship to the Indian tribes.
 
 
 35
 We cannot agree. First, the arguments all overlook the plain wording of the condemnation authorization to "All towns and cities . . . to secure by condemnation or otherwise, All the lands actually necessary for public improvements, Regardless of tribal lines . . ." 30 Stat. at 498. The authorization is thus in broad terms and without limitation to allotted parcels. The important provision for necessary public improvements "without regard to tribal lines" could have been limited easily to individually allotted parcels of land, but Congress did not do so. The statute is lengthy, detailed and carefully constructed. We feel that its clear language should not be disregarded and that the provision for public improvements should not be restricted by reading limitations into it which could have been written in, if intended.
 
 
 36
 Second, the placing of the condemnation provision in Sec. 11 is not determinative. It is true that the section deals in large part with allotments. However, it also provides for several other uses of Unallotted tribal lands such as by stipulating that there "shall also be Reserved from allotment a sufficient amount of lands now occupied by churches, schools, parsonages, charitable institutions, and other public buildings for their present actual and necessary use, and no more, not to exceed five acres for each school and one acre for each church and each parsonage, and for such new schools as may be needed; also sufficient land for burial grounds where necessary." 30 Stat. 497-98 (emphasis added). Obviously portions of Sec. 11 also dealt with several other uses to which Unallotted tribal lands were to be devoted. Hence the placing of the provision for public improvements of cities and towns in Sec. 11 does not demonstrate an intent to restrict the improvements to individual allotted parcels. And, in fact, it would seem impracticable to confine such condemnation for necessary public improvements to individual allotted parcels and not authorize them on tribal lands.
 
 
 37
 Third, the historical background of the statutes and treaties does not persuade us that restriction of such public improvements to allotted lands of individuals was intended. Such a restriction of the condemnation authority is not supported by the legislative history, although the Government argues to the contrary.[18] It is true that one principal object of the Curtis Act was the allotment of land to individual Indians. But it is also true that important provisions of the statute concerned the developing cities and towns in the Indian Territory. Section 14 of the same Act, reproduced in part in the Appendix, went to lengths to provide for the creation of cities and towns and the powers to be exercised by them. And that section refers to securing title to lands "From the tribe."[19] (emphasis added). It is thus in line with the scheme of the Curtis Act that unallotted tribal lands could be obtained by cities and towns for public improvements by acquisition or condemnation as provided by Section 11.
 
 
 38
 Lastly, the concern that unsupervised condemnation of unallotted as well as allotted lands might be a breach of the Government's trust relationship to the Indians is unpersuasive. The condemnation procedure was required to follow Mansfield's Digest of the Statutes of Arkansas. Chief Judge Phillips pointed out in Choctaw & Chickasaw Nations v. City of Atoka, Oklahoma, 207 F.2d at 767 (10th Cir.), that Section 908 of Mansfield's Digest provides for assessment by a jury of compensation for the land taken and that Section 910 provides that as soon as compensation has been assessed by the jury, the court shall make such order as to its payment or deposit as shall be deemed right and proper.[20] Thus the tribes had the right to a jury verdict for just compensation, rendered under the supervision of a judge of the United States Court for the Territory.
 
 
 39
 We cannot say that the congressional choice of this procedure was a breach of trust or that this factor argues for a restriction of the condemnation authorization granted to cities and towns by Sec. 11. "We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the government exercised its best judgment in the premises." Lone Wolf v. Hitchcock, 187 U.S. 543, 568, 23 S.Ct. 216, 222, 47 L.Ed. 299.
 
 
 40
 On this question whether Sec. 11 of the Curtis Act authorized condemnation of unallotted tribal lands, we must not overlook our earlier decision in Choctaw & Chickasaw Nations v. City of Atoka, 207 F.2d 763 (10th Cir.). Although the opinion does not state that the land involved in that case was unallotted, the trial judge there formally found that the "lands involved in this lawsuit were a part of the common tribal domain of the Choctaw and Chickasaw Nations, none of which was allotted to members of the Choctaw and Chickasaw Tribes of Indians." 1 Transcript of Records of Briefs, United States Court of Appeals, 10th Circuit, September Term 1953 at 824. Moreover, the court there used language indicating the fact that unallotted lands were involved. The opinion recites parts of the judgment stating that the compensation made was "in full of all right, title and interest Of said (Nations) in and to said lands and grounds." (emphasis added). The opinion also pointed to a trial court finding of authority to condemn "a full fee simple In whatever tribal lands it needed for waterworks and watershed purposes . . ." (Id. at 765) (emphasis added).
 
 
 41
 Thus, our City of Atoka opinion dealt with unallotted tribal lands of these tribes, just as the instant case does, and decided the question of authority for condemnation under the Curtis Act. There this court held, in an opinion by Chief Judge Phillips, that Sec. 11 of the Act authorized the condemnation by the city for waterworks purposes. We are not persuaded to depart from that holding.
 
 
 42
 In sum we conclude that the Curtis Act did authorize the condemnation proceedings in question here and that the Act gave the legislative consent of the United States to the acquisition by the City of McAlester of the easement by those proceedings as they were conducted.
 
 III
 
 43
 THE CLAIM THAT THE CITY HAS PERMITTED IMPROPER USES OF THE
 
 EASEMENT FOR NON- WATERSHED PURPOSES
 
 44
 Finally the Government argues that even if the City acquired a valid easement in 1903, its use of the easement was limited to that which was necessary or incidental to the watershed purpose for which the easement was granted, that the land could not be used in any way which would increase the burden of the easement without permission of the Nations, and that unauthorized and improper activities have been permitted by the City, exceeding the easement. (Brief for the United States, 12-13; Reply Brief for the United States, 4).
 
 
 45
 The trial court noted that the parties agreed that the City has made the following uses of the property which was the subject of the 1903 condemnation action (410 F.Supp. at 851-52):
 
 
 46
 (1) Leasing to individuals including J. T. Hall, a/k/a Joe Turner Hall, Earnest Berry, Phillip Orlandees, Don Ketcham, and Joe Whitefield, for the purpose of growing, cultivating, gathering, baling, and related efforts designed toward obtaining and selling hay;
 
 
 47
 (2) (Permitting) and (encouraging) Jim Burrows and Charley Chiusana to occupy residences upon the McAlester Watershed, which residences were placed there by the City of McAlester;
 
 
 48
 (3) Leasing parcels of subject real estate to utility companies for the purpose of building antennas;
 
 
 49
 (4) Issuing hunting, fishing and grazing permits upon and over the subject real property;
 
 
 50
 (5) Erecting archery shooting ranges and picnic areas; and
 
 
 51
 (6) Partitioning the subject property with fences.
 
 
 52
 The Choctaw and Chickasaw Nations have received none of the revenues from these transactions.
 
 
 53
 As noted, there was testimony at trial that the primary use of the watershed easement acquired from the Choctaw and Chickasaw Nations is to serve as the primary water supply source for the City of McAlester. Two lakes, a filtration plant, and the main transmission lines from the plant are located on the watershed. (I R. 13-14). This evidence was uncontradicted. Thus at least a substantial part of the land subject to the easement is used for the public purpose defined in the condemnation judgment, and that use is a public improvement within the meaning of Sec. 11 of the Curtis Act.
 
 
 54
 The 1903 judgment provided that the City have "an easement in and to, and shall enter upon take hold and acquire the lands described in the plaintiff's amended petition as follows, to wit: . . ." There then follow, under the heading "Description of Water Shed," legal descriptions of 24 parcels of land with the specific acreage of each parcel stated, followed by the total "2530" acres.[21] Thereafter an additional description by metes and bounds appears under the heading "Right of Way for Pipe Line and Road way," followed by the statement "Area . . . 5.8 acres." (II R. 117).
 
 
 55
 The judgment stated that the easement was granted
 
 
 56
 for the purpose of a watershed and basin and erecting, maintaining and using a waterworks system for said plaintiff, the City of South McAlester, to have and to hold and possess said easement so long as the same shall be used for the purposes heretofore set out.
 
 
 57
 The trial court rejected the Government's arguments that the City has exceeded the authority granted to it by the 1903 easement. The court stated it must determine "whether each (of the challenged uses) is inconsistent with the easement held by the City of McAlester 'for the purpose of a watershed and basin and erecting, maintaining and using a waterworks system'." 410 F.Supp. at 857.
 
 
 58
 Applying this test, the court found that the hay permit to J. T. Hall was a "proper and authorized use of the subject lands" and was "not inconsistent nor contrary to the maintenance of a watershed." Id. at 857. For similar reasons the court denied relief against hay permits to others. The court also found that occupation of the Burrows and Chiusana residences by watershed officers for protection of the lands was "consistent with the purpose for which the easement was granted." Id. at 857-58.
 
 
 59
 It was also found that uses of the easement lands for fishing, hunting, picnic areas, archery and police firing ranges were not "inconsistent with the maintenance of the watershed and that such uses do not interfere with the primary purpose of the easement" and that recreational use of the lands by the public was "incidental to the primary purpose of the land as a water supply." Id. at 858. And the court found that the construction of fences was not "improper" when they do not interfere with the flow of water or thwart the purposes of the watershed and basin and that fences may be necessary to maintain peace, to prevent vandalism, and to prevent the public from entering restricted areas. Id. at 858.
 
 
 60
 Turning to the pasture leases, the court found that use of the lands for grazing did not "in itself constitute an improper use and interfere with the lands as a watershed" and that pasture leases "may be a reasonable and efficacious method of preserving the watershed." Id. at 859. Relief against such use was denied.
 
 
 61
 The use of the lands for television and telephone antennas was found not to fit easily into any of the categories already mentioned. However, it was found under the reasoning of United States v. Oklahoma Gas & Electric Co., 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716, that the public and individuals benefitted from the telephone antenna and that leases for the antenna did not obstruct or interfere with the watershed easement, that the television antenna supported a public recreational service, that the leases for both telephone and television antennas were not inconsistent with use of the lands as a watershed easement and basin, and that such construction did not injure the fee title interest of the Indian Nations. Id. at 860.
 
 
 62
 For these reasons all relief against the challenged uses of the easement lands was denied. The Government claims error, arguing that the uses in question were not necessary or incidental to the watershed easement granted to the City, relying on Hudson v. Lee, 393 P.2d 515 (Okl.); Wilcox Oil Co. v. Bradberry, 208 Okl. 546, 257 P.2d 1096; and Town of Ft. Cobb v. Robinson, 193 Okl. 660, 143 P.2d 122. Because we feel that the trial court was principally relying on the test whether the uses in question were improper or inconsistent with the watershed easement, which we conclude was an improper test to apply with respect to these claims of the Indian Nations, we remand this issue for reconsideration by the trial court.
 
 
 63
 Although federal law governs the conveyance of the tribal property, in the absence of a contrary statutory indication state law determines issues relating to the scope of an easement over tribal property once granted. United States v. Oklahoma Gas & Electric Co., 318 U.S. 206, 209-210, 63 S.Ct. 534, 87 L.Ed. 716. Thus we must focus primarily on Oklahoma law dealing with rights of the parties where such an easement exists.
 
 
 64
 Probably the case closest to our problem is Town of Ft. Cobb v. Robinson, 193 Okl. 660, 143 P.2d 122. There conveyance was made to the City of approximately two acres of land "to be used for the purpose of exploring for water." Subsequent owners of the land brought a quiet title action against the City, in part challenging its right to build a fence around the two acres. The trial court ordered removal of the fence but the Oklahoma Supreme Court reversed. Referring to the action as one to enjoin improper use of an easement, the Court stated (Id. at 123):
 
 
 65
 (2) The conveyance of an easement gives to the grantee all such rights as are incident or necessary to the reasonable and proper enjoyment of the easement.
 
 
 66
 (3) Where the easement requires for its enjoyment a use of the land permanent in its nature and practically exclusive the right conveyed is inconsistent with the concurrent occupancy by a grantor or his assigns . . .
 
 
 67
 The Court said further that the City had drilled wells and used the premises for production of water, that stock of the plaintiffs had begun to molest the defendant's wells and equipment, that the defendant had then had the two acres fenced, and that if the evidence showed it was necessary to protect the water supply by erection of a fence, the exercise of this discretion "was a proper use reasonably incident to the easement." 143 P.2d at 123. The Oklahoma Court again referred to the rights obtained by the grant of an easement as being those "incident or necessary to the reasonable and proper enjoyment of the easement" in Hudson v. Lee, 393 P.2d 515, 518-19 (Okl.); See also City of Elk City v. Coffey, 562 P.2d 160, 163 (Okl.Ct.App.).
 
 
 68
 It is true that United States v. Oklahoma Gas & Electric Co., 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716, gives some support to the test applied by the trial court. In determining whether a private electric transmission line was properly permitted by the State of Oklahoma to be constructed on its highway easement across allotted Indian lands, the Court there did say that the transmission line would not endanger highway travel, that bringing in electric power was as essential as many other uses of the highway, and that the State had permitted no use which would obstruct or interfere with the use for which the highway was established. Id. at 211, 63 S.Ct. 534. The trial court thus had a plausible reason for its analysis based on whether the uses in question here were "inconsistent" with the watershed easement, or were "improper," or whether such uses "interfere" with the use of the lands as a watershed. However, the subsequent Ft. Cobb and Hudson opinions of the Oklahoma Court seem to define the test rather clearly in terms of what is "incident or necessary to the reasonable and proper enjoyment of the easement." 143 P.2d at 123. See also Ponca City v. Drummond, 94 Okl. 138, 221 P. 466, 467 (Okl.1923).
 
 
 69
 For these reasons we conclude that the findings, the conclusions and the portion of the judgment pertaining to the challenged uses of the easement should be vacated and the case should be remanded on this issue for reconsideration. The trial court can decide what further proceedings may be necessary to determine whether the uses in question are incident or necessary to the reasonable and proper enjoyment of the watershed easement and the pipeline and roadway easement of the City and, if any such uses be found unauthorized, then the proper relief to be granted.
 
 
 70
 We note one further point pertinent to the remand. The condemnation judgment (II R. 117) separately states the "Description of Water Shed" of 2530 acres and the description in metes and bounds of the "Right of Way for Pipe Line and Road Way" of 5.8 acres. As the Ft. Cobb opinion illustrates, the nature and extent of rights under a watershed easement may be greater than those incident to a pipeline and roadway easement. Compare 3 Nichols, Law of Eminent Domain, Sec. 11.207(4), With id. Sections 11.203 and 11.206. While this circumstance has not been pointed out by the parties, we feel it should be taken into account on remand for whatever proper effect it should be given.
 
 
 71
 Accordingly, we affirm the trial court's judgment as to the holding that the Choctaw and Chickasaw Nations own the fee simple title to the described lands, subject to the easement of the City of McAlester, and we affirm the ruling of the trial court that the easement of the City is valid. The findings, conclusions and judgment of the trial court are vacated with respect to the claims of improper uses of the easement by the City and the cause is remanded for reconsideration of those claims as provided herein.
 
 
 72
 IT IS SO ORDERED.
 
 APPENDIX
 
 73
 The Curtis Act, Act of June 28, 1898, 30 Stat. 495 Et seq., provides in part as follows:
 
 
 74
 SEC. 11. That when the roll of citizenship of any one of said nations or tribes is fully completed as provided by law, and the survey of the lands of said nation or tribe is also completed, the commission heretofore appointed under Acts of Congress, and known as the "Dawes Commission," shall proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof, considering the nature and fertility of the soil, location, and value of same; but all oil, coal, asphalt, and mineral deposits in the lands of any tribe are reserved to such tribe, and no allotment of such lands shall carry the title to such oil, coal, asphalt, or mineral deposits; And all town sites shall also be reserved to the several tribes, and shall be set apart by the commission heretofore mentioned as incapable of allotment. There shall also be reserved from allotment a sufficient amount of lands now occupied by churches, schools, parsonages, charitable institutions, and other public buildings for their present actual and necessary use, and no more, not to exceed five acres for each school and one acre for each church and each parsonage, and for such new schools us may be needed; also sufficient land for burial grounds where necessary. When such allotment of the lands of any tribe has been by them completed, said commission shall make full report thereof to the Secretary of the Interior for his approval: Provided, That nothing herein contained shall in any way affect any vested legal rights which may have been heretofore granted by Act of Congress, nor be so construed as to confer any additional rights upon any parties claiming under any such Act of Congress: Provided further, That whenever it shall appear that any member of a tribe is in possession of lands, his allotment may be made out of the lands in his possession, including his home if the holder so desires: Provided further, That if the person to whom an allotment shall have been made shall be declared, upon appeal as herein provided for, by any of the courts of the United States in or for the aforesaid Territory, to have been illegally accorded rights of citizenship, and for that or any other reason declared to be not entitled to any allotment, he shall be ousted and ejected from said lands; that all persons known as intruders who have been paid for their improvements under existing laws and have not surrendered possession thereof who may be found under the provisions of this Act to be entitled to citizenship shall, within ninety days thereafter, refund the amount so paid them, with six per centum interest, to the tribe entitled thereto; and upon their failure to do so said amount shall become a lien upon all improvements owned by such person in such Territory, and may be enforced by such tribe; and unless such person makes such restitution no allotments shall be made to him: Provided further, That the lands allotted shall be nontransferable until after full title is acquired and shall be liable for no obligations contracted prior thereto by the allottee, and shall be nontaxable while so held: Provided further, That all towns and cities heretofore incorporated or incorporated under the provisions of this Act are hereby authorized to secure, by condemnation or otherwise, all the lands actually necessary for public improvements, regardless of tribal lines; and when the same cannot be secured otherwise than by condemnation, then the same may be acquired as provided in sections nine hundred and seven and nine hundred and twelve, inclusive, of Mansfield's Digest of the Statutes of Arkansas. (Emphasis added)
 
 
 75
 SEC. 13. That the Secretary of the Interior is hereby authorized and directed from time to time to provide rules and regulations in regard to the leasing of oil, coal, asphalt, and other minerals in said Territory, And all such leases shall be made by the Secretary of the Interior; and any lease for any such minerals otherwise made shall be absolutely void. (Emphasis added)
 
 
 76
 SEC. 14. That the inhabitants of any city or town in said Territory having two hundred or more residents therein may proceed, by petition to the United States court in the district in which such city or town is located, to have the same incorporated as provided in chapter twenty-nine of Mansfield's Digest of the Statutes of Arkansas, if not already incorporated thereunder
 
 
 77
 and such city or town government, when so authorized and organized, shall possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas.
 
 
 78
 Such city or town governments shall in no case have any authority to impose upon or levy any tax against any lands in said cities or towns until after title is secured from the tribe; but all other property, including all improvements on town lots, which for the purposes of this Act shall be deemed and considered personal property, together with all occupations and privileges, shall be subject to taxation.
 
 
 79
 SEC. 15. . . . And all town lots shall be appraised by said commission at their true value, excluding improvements; and separate appraisements shall be made of all improvements thereon; and no such appraisement shall be effective until approved by the Secretary of the Interior, and in case of disagreement by the members of such commission as to the value of any lot, said Secretary may fix the value thereof.
 
 
 80
 All town lots not improved as aforesaid shall belong to the tribe, and shall be in like manner appraised, and, after approval by the Secretary of the Interior, and due notice, sold to the highest bidder at public auction by said commission, but not for less than their appraised value, unless ordered by the Secretary of the Interior; and purchasers may in like manner make deposits of the purchase money with like effect, as in case of improved lots.
 
 
 81
 The person authorized by the tribe or tribes may execute or deliver to any such purchaser, without expense to him, a deed conveying to him the title to such lands or town lots; and thereafter the purchase money shall become the property of the tribe; and all such moneys shall, when titles to all the lots in the towns belonging to any tribe have been thus perfected, be paid per capita to the members of the tribe . . .
 
 
 82
 McWILLIAMS and WILLIAM E. DOYLE, Circuit Judges, dissent from the Opinion on rehearing and adhere to our earlier Opinion.
 
 
 83
 McKAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 84
 I dissent from the en banc conclusion and adhere to the views expressed by Chief Judge Markey in his opinion for the original three-judge panel which is being simultaneously published. If the court had adhered to those views it would not have been necessary to reach the issues treated in Part III of today's majority opinion. Inasmuch as the court has reached the issues discussed in Part III, I wish to express my concurrence in that portion of the opinion.
 
 
 85
 The three-judge panel opinion by Chief Judge Markey of the United States Court of Customs and Patent Appeals, which is referred to above by Judge McKay, is as follows:
 
 
 86
 Before McWILLIAMS and WILLIAM E. DOYLE, Circuit Judges, and MARKEY, Chief Judge.*
 
 
 87
 MARKEY, Chief Judge.
 
 
 88
 Appeal from a judgment of the United States District Court for the Eastern District of Oklahoma, 410 F.Supp. 848 (E.D.Okl.1976), holding valid an easement enjoyed by the City of McAlester over lands owned by the Choctaw and Chickasaw Nations, and denying declaratory and injunctive relief sought by the United States. We reverse and remand.
 
 Background
 
 89
 At the request of the Secretary of the Interior, the United States brought this action, in its own right and, in its fiduciary capacity, on behalf of the Choctaw and Chickasaw Nations against the City of McAlester, a/k/a City of South McAlester, (McAlester) and certain named and unnamed defendants. The United States sought: (1) a judicial determination that an easement over tribal lands for the purpose of a watershed, basin, and waterworks system obtained by McAlester on January 31, 1903, was invalid; (2) to quiet title in the Choctaw and Chickasaw Nations to the tribal lands in question; (3) an injunction against McAlester preventing it from issuing permits, leases, licenses, and otherwise using the tribal lands without authority; and (4) damages for unauthorized use of the lands. Jurisdiction was under 28 U.S.C. § 1345.[1]
 
 
 90
 The lands in question are owned jointly by the Choctaw and Chickasaw Nations. The Choctaw Nation acquired rights in those lands by virtue of the Treaty at Dancing Rabbit Creek, 7 Stat. 333 (1830), and a subsequent patent of March 23, 1842. The Chickasaw Nation holds rights in the lands pursuant to the Treaty of January 17, 1837, 11 Stat. 573 and the Treaty of June 22, 1855, 11 Stat. 611. Historical precursors to those treaties will be discussed infra.
 
 
 91
 On January 21, 1903, a federal territorial court for the district of Oklahoma entered a judgment, City of South McAlester v. The Choctaw and Chickasaw Nations of Tribes of Indians, No. 3293 (C.D.Ind.Terr.1903), granting McAlester the easement here involved. The easement included 2535.8 acres and was for:
 
 
 92
 (T)he purpose of a watershed and basin and erecting, maintaining and using a waterworks system for said plaintiff, the City of South McAlester, to have and to hold and possess said easement so long as the same shall be used for the purposes heretofore set out.
 
 
 93
 The Choctaw and Chickasaw Nations received $6,515.00 for the easement. The only document found concerning that judgment, styled "Condemnation Proceedings," recites that the named parties in that action were the City of South McAlester and the Choctaw-Chickasaw Nations, appearing through their attorneys, who executed a stipulation for judgment granting McAlester the easement. No mention is made of the United States as a party to that action.
 
 
 94
 In 1950, the Choctaw-Chickasaw Nations brought an action in the United States District Court for the Eastern District of Oklahoma against McAlester, seeking to quiet title to the same 2535.8 acres involved here. The Choctaw-Chickasaw Nations also sought, as the United States does here, to have the 1903 condemnation action declared void. In early 1951, the Choctaw Nation's motion to join the United States as a party defendant was granted. A supplemental complaint was filed and served on the United States. On April 13, 1951, the United States moved to dismiss, on the ground that it had not consented to be sued. On May 9, 1952, that motion was granted and the case was dismissed with respect to the United States.[2] The case with respect to McAlester proceeded to a judgment determining that the Choctaw-Chickasaw Nations were fee simple owners of the lands in question, subject to the easement held by McAlester. The Choctaw and Chickasaw Nations v. City of McAlester, Oklahoma, No. 2781-Civil (E.D.Okl. Sept. 10, 1952).
 
 
 95
 In 1970,[3] McAlester began permitting these uses for the easement:
 
 
 96
 1. Leasing to individuals including J. T. Hall, a/k/a Joe Turner Hall, Earnest Berry, Phillip Orlandees, Don Ketcham, and Joe Whitefield, for the purpose of growing, cultivating, gathering, baling, and related efforts designed toward obtaining and selling hay;
 
 
 97
 2. Permitted and encouraged Jim Burrows and Charley Chiusana to occupy residences upon the McAlester watershed, which residences were placed there by the City of McAlester;
 
 
 98
 3. Leasing parcels of subject real estate to utility companies for the purpose of building antennas;4. Issuing hunting, fishing and grazing permits upon and over the subject real property;
 
 
 99
 5. Erecting archery shooting ranges, and picnic areas; and
 
 
 100
 6. Partitioning the subject property with fences. (410 F.Supp. at 851-52.)
 
 
 101
 McAlester says its revenue from leases, permits, and licenses, defrays the costs of maintaining the area. Neither the Choctaw-Chickasaw Nations nor the United States have received any such revenue.
 
 
 102
 At the request of the Choctaw-Chickasaw Nations, the United States filed the present action in 1975. Following a nonjury trial, the court issued its order on February 17, 1976, holding: (1) that the Choctaw-Chickasaw Nations are fee simple owners of the lands in question, subject only to the easement held by McAlester; (2) that the easement is valid; and (3) that the listed uses are consistent with the primary purpose for the easement, i. e., as a watershed and basin.
 
 The Arguments
 
 103
 The United States contends that the District Court erred in holding the easement valid because the United States, though indispensable, was not party to the 1903 condemnation proceeding. The United States further contends that, if the easement is valid, the present uses of the property are wholly beyond its terms. McAlester argues that the use and enjoyment of an easement contemplates exclusive possession of the land involved, so long as the uses are not inconsistent with the easement's primary purpose, and that the present uses are not inconsistent with its easement.
 
 The Issue
 
 104
 The dispositive issue is whether the McAlester easement is valid. Ownership of the involved lands is not questioned, and we do not reach the issue of whether McAlester's uses are consistent with the easement.
 
 OPINION
 The 1903 Proceedings
 
 105
 The parties agreed, and the trial court found, that the United States was an indispensable party to the 1903 condemnation proceedings and that its absence therefrom would enable the bringing of this action for a declaration that the easement is invalid. McAlester contends that the burden of proving it was not a party was on the United States, and that the present action is a collateral attack upon the 1903 judgment, requiring that the United States overcome the presumption that the 1903 court had the necessary parties before it, citing Choctaw and Chickasaw Nations v. City of Atoka, 207 F.2d 763 (10th Cir. 1953).
 
 
 106
 In Atoka the Choctaw-Chickasaw Nations sued the City of Atoka, Oklahoma, to quiet title to a 450.96 acre tract used by Atoka for a water supply, and to invalidate a 1907 condemnation proceeding which had resulted in a judgment, No. 1789, upholding the condemnation and reciting "that no appearance had been entered 'for any of the claimants of the land sought to be condemned, Although notified of this proceeding as required by law * * *.' " Emphasis added, 207 F.2d at 764. The courthouse in Atoka having been partially destroyed by fire, some papers of the 1907 proceedings were destroyed and the papers remaining did not themselves show whether the United States was a party. The Atoka court held that: "On a collateral attack on a judgment of a court of general jurisdiction it will be presumed, unless the contrary affirmatively appears, that all parties to the action were properly served with process." 207 F.2d at 766. We recognize the salient value of the presumption in aid of the finality of judgments and the termination of disputes. There is, however, an important factual distinction in the present case, effective to rebut the presumption.
 
 
 107
 In Atoka, the judgment expressly stated that all claimants had been notified "as required by law." Though we will never know with certainty whether the United States was properly notified, the language of the judgment itself raised a reasonable presumption that it was. In the present case, the 1903 judgment contains nothing from which it could be inferred, much less presumed, that the United States was a party to that action, or was notified of it, and the absence of the United States appears affirmatively on the face of the 1903 judgment, as follows:
 
 
 108
 City of South McAlester, vs. The Choctaw and Chickasaw
 
 Nations of Tribes of Indians, No. 3293
 CONDEMNATION PROCEEDINGS
 
 109
 On this 21st, day of January, 1903 * * * the plaintiff, City of McAlester, * * * and the defendants, the Choctaw and Chickasaw Nations * * * and thereupon a stipulation heretofore entered into be (sic) and between said parties hereto was presented and ordered filed * * * towit:
 
 
 110
 "Stipulation for Judgment"
 
 
 111
 "Comes the defendants, the Choctaw and Chickasaw Nations, and stipulate to the plaintiff, the City of South McAlester, as follows:
 
 
 112
 "It is further * * * agreed that of said sum, the sum of $1,628.75 * * * shall be paid to the Treasurer of the Chickasaw Nations * * * and that the sum of $4,886.25 * * * shall be paid to the Treasurer of the Choctaw Nation * * *.
 
 
 113
 "Executed in triplicate on this twenty-first day of January, 1903.
 
 Wm. Costigan, Attorney for
 
 114
 City of South McAlester.
 
 Mansfield, McMurray & Cornish
 Attorneys for Choctaw and
 
 115
 Chickasaw Nations."
 
 
 116
 And now both parties announce ready for trial, whereupon come a jury as follows, towit (sic):
 
 
 117
 "We the jury * * * find the issues in favor of the City of South McAlester, and assess the damages to the Choctaw and Chickasaw Nations at $6,515.00.
 
 
 118
 The judgment continues with the court's orders referring only to the plaintiff, City of South McAlester, and to the defendants, the Choctaw and Chickasaw Nations. Nowhere is there any mention, by implication, inference or otherwise, that the United States was a party or was notified of the action. The style of the action, the parties named throughout, the recited appearances, the named recipients of the judgment monies, the signatures to the stipulation, the jury verdict, and the court's orders, all indicate that the only parties to the action were the Choctaw-Chickasaw Nations and McAlester.
 
 
 119
 The United States, faced with the negative burden of proving that it was Not a party to the 1903 judgment, has, in our view, adduced the most reasonable and competent evidence possible under the circumstances. Judgments mention only the parties sub judice, not those absent. If judgment papers totally devoid of mention, direct or indirect, of the United States were insufficient, the United States would be estopped from attacking any judgment that did not contain a statement like: "The United States was not a party to these proceedings." In the present case, where the 1903 judgment papers constituted at least prima facie proof that the United States was neither present nor notified, the burden shifted to McAlester to supply some contrary indication. McAlester introduced no evidence from which it might be inferred or presumed that the United States was a party to, notified of, or in any manner associated with the 1903 judgment.
 
 
 120
 Accordingly, we agree with the trial court that "the burden placed upon the United States, being a party collaterally attacking a judgment, has been met and that the evidence establishes that the United States was not a party to the condemnation proceedings had by (McAlester) in 1903."[4] 410 F.Supp. at 854.
 
 
 121
 The trial court went on to hold that, although the United States must be deemed absent from the 1903 proceedings, the easement obtained by McAlester in those proceedings was valid. With that conclusion we disagree.
 
 Validity of the Easement
 
 122
 The trial court reasoned that McAlester's easement was valid because its 1903 condemnation was a lawful exercise of its right of eminent domain. The court's rationale was that McAlester had the right to condemn the lands, and hence, if the United States had been a party it could not have prevented the condemnation. The court found McAlester's right to condemn in the Act of March 3, 1901, ch. 832, § 3, 31 Stat. 1084 (current version at 25 U.S.C. § 357 (1970)), which provides:
 
 
 123
 Lands Allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee. (Emphasis added.)
 
 
 124
 Section 3 of the Act, relied upon by the trial court, provided authority only for condemnation of Allotted lands. United States v. Oklahoma Gas Co., 318 U.S. 206, 214-15, 63 S.Ct. 534, 87 L.Ed. 716 (1943); See also, United States v. 10.69 Acres of Land, 425 F.2d 317, n. 1 (9th Cir. 1970). The statute makes no mention of Unallotted lands. The parties are agreed that the lands in question were unallotted and that, accordingly, § 3 of the 1901 Act furnishes no authority for condemnation. The district court was therefore in error.
 
 
 125
 McAlester argues, however, that it acquired the property "under the authority of the Act of June 28, 1898, 30 Stat. 495, commonly called to the Curtis Bill (Act)," which it says applied to unallotted lands. The United States responds that the condemnation provision of the Curtis Act appears in a section entitled "allotment" and that that provision is shown by subsequent statutes to be applicable to only allotted lands, citing the Act of March 3, 1901, 31 Stat. 1084, § 4, and the Act of March 2, 1899, 30 Stat. 990. The United States further responds that the crucial absence of authority to condemn tribal lands is reflected in 25 U.S.C. § 177, under which conveyances from any Indian Nation are invalid absent a treaty or convention. Other than its broad reliance on the Curtis Act, McAlester supplies no argument refuting the position of the United States.
 
 
 126
 The statute prohibiting conveyance of tribal lands other than by treaty or convention, 25 U.S.C. § 177 (1970), had its genesis 187 years ago. The first Indian Intercourse Act, Act of July 22, 1790, 1 Stat. 137, provided:
 
 
 127
 (N)o sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.
 
 
 128
 The second Indian Intercourse Act, Act of March 1793, 1 Stat. 329, provided criminal sanctions for negotiation of a treaty or convention without authority from the United States. With minor modifications, the Act was repeatedly reenacted (Act of May 19, 1796, 1 Stat. 469; Act of March 3, 1799, 1 Stat. 743; Act of March 30, 1802, 2 Stat. 139; Act of June 30, 1834, 4 Stat. 729; R.S. § 2116), culminating in the current Act, 25 U.S.C. § 177, which provides, in pertinent part:
 
 
 129
 No * * * conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or in equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. * * *
 
 
 130
 The 1834 version of that section has been interpreted:
 
 
 131
 No private person ever could make a lawful purchase of land from any Indian nation residing within the territory and under the protection of the United States. * * * To prevent it, the act of Congress "to regulate trade and intercourse with the Indian tribes * * * " was passed on the 30th June, 1834, (current § 177) which makes every * * * conveyance from a nation or tribe of Indians altogether void, unless it be made by treaty, pursuant to the Constitution. * * * I cannot think that it applies merely to those Indian tribes who hold their lands by the original Indian title. The words are broad enough to include a tribe holding lands by patent from the United States, and the purpose of the statute manifestly requires it receive that construction. (9 Op.Att'y.Gen. 24, 26 (1857).)
 
 
 132
 McAlester cites no treaty, convention, or other express authority from the United States, in support of its 1903 condemnation, but relies entirely on the Curtis Act, Act of June 28, 1898, ch. 517, § 11, 30 Stat. 495, which includes:
 
 
 133
 That all towns and cities heretofore incorporated or incorporated under the provisions of this Act are hereby authorized to secure, by condemnation or otherwise, all the lands actually necessary for public improvements, regardless of tribal lines; and when the same can not be secured otherwise than by condemnation, then the same may be acquired as provided * * * (in) Mansfield's Digest of the Statutes of Arkansas.
 
 
 134
 Though the quoted language contains no restriction on the power to condemn either allotted or unallotted Indian lands, that portion of the statute appears as the fifth proviso in section 11 of the Curtis Act. The entire section 11 deals exclusively with the allotment of Indian lands by the Dawes Commission, a circumstance arguing strongly for the view that the power to condemn was limited to allotted lands.
 
 
 135
 The legislative history of § 11 offers little aid. The Curtis Act was introduced by Representative Curtis of Kansas on February 24, 1898. 31 Cong.Rec. 2154 (1898). The condemnation provision was not in the original bill, but was inserted by the Senate Committee on Indian Affairs. The Committee did not publish a report, but its recommendations were reported on June 6, 1898, at 31 Cong.Rec. 5552. Though discussion was had on several amendments, no discussion was directed to the condemnation provision.[5] The debates, however, reveal that Congress considered the United States as having a paramount interest in Indian lands and that Congress was interested in dissolving what it considered corrupt tribal governments and allotting tribal land to individual members of the tribes.
 
 
 136
 Though legislative history of § 11 offers little aid, a broader view of history sheds light on the congressional intent animating the Curtis Act.
 
 
 137
 Through the Treaty of Hopewell, 7 Stat. 21 (1786) and a subsequent Treaty of December 17, 1801, 7 Stat. 66, the Choctaws granted the United States large tracts of land to serve the westward migration of new settlers. Though the Choctaws continued to live on lands not granted, "the Indians were not considered to own the fee title to the land * * * they did have the right to the exclusive use and occupancy of the land a right that could be ceded only to the United States." Choctaw Nation v. Oklahoma, 397 U.S. 620, 623, 90 S.Ct. 1328, 1330, 25 L.Ed.2d 615 (1970). The westward march had just begun. Fires of expansion were fueled by the Louisiana Purchase in 1803, and soon a westward relocation of the Indians was proposed. See Choctaw Nation, supra at n. 3. Agreeing to move westward, the Choctaw Nation ceded to the United States, in the Treaty of Doak's Stand, 7 Stat. 210 (1820), about one-half of its lands in Mississippi in exchange for a tract of land lying west of the Mississippi River and between the Arkansas and Red Rivers. Before the ink on the treaty had dried, however, it was discovered that white settlers already occupied the Choctaw Nation's new land. 1 F. Cohen, Handbook of Federal Indian Law, ch. 3, 84 (temp. ed. 1940). Signing another treaty, the Treaty of January 20, 1825, 7 Stat. 234, the Choctaw Nation ceded back to the United States lands east of a line marking the present boundary between Arkansas and Oklahoma. Though the Choctaw Nation resisted further moves, the Indian Removal Act of 1830, 4 Stat. 411, and Mississippi's extension of its laws to Choctaw territory, finally forced the Choctaw Nation to agree, in 1830, to relinquish all its lands east of the Mississippi River and to settle on lands west of the Arkansas Territory. This was accomplished by the Treaty of Dancing Rabbit Creek, 7 Stat. 333 (1830), giving the Choctaw Nation fee simple ownership of the land "while they shall exist as a nation." A patent issued to the Choctaw Nation on March 23, 1842, confirming their ownership and granting the lands to the Choctaw Nation "to have and to hold the same, with all the rights, privileges, immunities, and appurtenances of whatsoever nature thereto belonging, * * * 'in fee simple to them and their descendants, to inure to them, while they shall exist as a nation and live on it,' liable to no transfer or alienation, except to the United States, or with their consent." See Choctaw and Chickasaw Nations v. United States, 1 Ind.Cl.Comm. 291, 293-94 (1950), Aff'd 121 Ct.Cl. 41 (1951). That patent conveyed the lands to the Choctaw tribe as a whole and did not operate for the benefit of individual members of the tribe. See Fleming v. McCurtain, 215 U.S. 56, 30 S.Ct. 16, 54 L.Ed. 88 (1909).
 
 
 138
 The Chickasaw Nation underwent a similar westward march, finally settling on a portion of the Choctaw lands under the Treaty of January 17, 1837, 11 Stat. 573 and the Treaty of June 22, 1855, 11 Stat. 611.
 
 
 139
 Settlers in the Indian Territory were unhappy with their inability to exercise political control over the lands in which they lived and with their inability to obtain title to tribal lands. Harjo v. Kleppe, 420 F.Supp. 1110, 1121 (D.D.C.1976). See also, Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912). The settlers "demand(ed) that the communal tenure and tribal governments be abolished in favor of both individual tenure in which the lands could pass freely into white hands and the political reorganization of the Territory into a state." Harjo, supra at 1121. The settlers' leading congressional ally was Senator Henry L. Dawes of Massachusetts. At Dawes' insistance, Congress passed the Dawes Severalty Act, ch. 119, 24 Stat. 388 (Feb. 8, 1887), providing for allotment of reservation land and the purchase of unallotted land by the United States for homesteading. If the Five Civilized Tribes were elated by their specific exemption from the Act (§ 8), that elation was short-lived.
 
 
 140
 Two years later Congress created a commission, Act of March 3, 1893, ch. 209, § 16, 27 Stat. 645, headed by Dawes (then retired from the Senate) to negotiate with the Five Tribes over relinquishment of their title by cession to the United States or by allotment to the Tribes' members. Despite reluctance to do so, the Choctaws and Chickasaws finally entered into an agreement, the Atoka agreement, with the Dawes Commission on April 23, 1897. That agreement was incorporated in the Curtis Act, providing for forced allotment of Indian lands to tribal members and termination of tribal affairs. See Choctaw Nation v. Oklahoma, supra; Mullen v. United States, 224 U.S. 448 (1912); Choate v. Trapp, supra. The agreement was subsequently modified, in ways not important here, by the Act of July 1, 1902, ch. 1362, 32 Stat. 641. Section 11 of the Curtis Act, the section pertinent herein, provided for those allotments.[6]
 
 
 141
 The historical perspective of the Curtis Act thus indicates that it was designed to provide settlers in Indian Territory a means by which they might exercise some control, political and possessory, over the lands in which they lived. To achieve that objective, the Curtis Act, incorporating the Atoka Agreement, provided for forced allotment and, within the same section (§ 11), condemnation. If Congress had intended to provide for condemnation of all Indian lands, allotted and unallotted, it would be reasonable to assume that it would have either passed an act specifically providing therefor (cf. Supra, note 5) or that it would have included a broad condemnation provision as a separate section of the Curtis Act, and would not have merely included a condemnation provision within the section devoted to allotment.
 
 
 142
 Moreover, if Congress had provided for unabated, unsupervised condemnation of all Indian lands in general, though it had the inherent power to do so, there would have been a serious question of whether the United States had thereby breached its trust relationship with the Indian tribes.
 
 
 143
 Accordingly, we are convinced that the Curtis Act contained no authorization for condemnation of unallotted Indian lands. Hence there existed no statutory authorization for condemnation by McAlester in 1903, and the easement obtained by McAlester by virtue of the 1903 judgment is invalid.
 
 
 144
 (The panel would have reversed and remanded.)[7]
 
 
 
 [1]
 Although the United States purports to bring this action in its own right, it asserts no property right of its own which it seeks to vindicate. Therefore, the claim asserted by the Government essentially states no more than the general fiduciary relationship of the Government to the Indian tribes which has long been recognized. See, e. g., Choctaw Nations v. United States, 119 U.S. 1, 27-28, 7 S.Ct. 75, 30 L.Ed. 306
 
 
 [2]
 See United States v. Candelaria, 271 U.S. 432, 443, 46 S.Ct. 561, 70 L.Ed. 1023; Alonzo v. United States, 249 F.2d 189 (10th Cir.)
 
 
 [3]
 The Government argues (Supplemental Memorandum on Rehearing, 3 n.2) that the City offered no proof that in 1903 it met the requirement of Sec. 11 of the Curtis Act, 30 Stat. 495, 498, of being "heretofore incorporated or incorporated under the provisions of this Act." In a collateral attack at this time the burden of demonstrating any such defect was on the Government, See Choctaw & Chickasaw Nations v. City of Atoka, 207 F.2d 763, 766 (10th Cir.), and the Government points to no proof it made in this respect. No claim by the Government of a defect in the City's proof on this point in the 1903 proceeding should be considered
 
 
 [4]
 The dismissal of the United States on the ground of sovereign immunity was in accordance with the procedure followed in Choctaw & Chickasaw Nations v. Seitz, 193 F.2d 456 (10th Cir.), with the result that the judgment is not binding on the United States
 
 
 [5]
 On this appeal the City maintains that the trial court erred in holding that the Government had successfully impeached the 1903 judgment by showing that the Government was not notified of that action. With this contention of the City we do not agree. We feel that the finding of the trial court that the Government was not a party to the 1903 proceeding is supported by competent evidence
 
 
 [6]
 In a similar earlier case this court assumed, without deciding, that the United States was an indispensable party to a condemnation action in the United States Court in the Indian Territory for the taking of tribal lands for a waterworks system. Choctaw & Chickasaw Nations v. City of Atoka, Oklahoma, 207 F.2d 763 (10th Cir.). We must now face that question which was not decided in the City of Atoka case
 
 
 [7]
 The original restraint was imposed by the General Allotment Act of 1887, c. 119, 24 Stat. 388, 389, 25 U.S.C. Sec. 348, and extended by later acts. E.g., Indian Reorganization Act of 1934, c. 576, 48 Stat. 984, 25 U.S.C. Sec. 462
 The restraint on alienation imposed by The General Allotment Act of 1887, which appears in 25 U.S.C. Sec. 348, did not apply to the Territory occupied by the Five Civilized Tribes in Oklahoma. See 25 U.S.C. Sec. 339.
 
 
 [8]
 See, e. g., Bowling v. United States, 223 U.S. 528, 34 S.Ct. 659, 58 L.Ed. 1080; Sunderland v. United States, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259; Privett v. United States, 256 U.S. 201, 41 S.Ct. 455, 65 L.Ed. 889
 
 
 [9]
 This language is the current version of the 1834 Non-Intercourse Act, 4 Stat. 730
 
 
 [10]
 As to legal title, the fee ownership of the tribal lands by the Choctaw and Chickasaw Nations distinguishes the instant case from Minnesota v. United States, 305 U.S. 302, 59 S.Ct. 382, 83 L.Ed.2d 235, where, in discussing the indispensability of the United States, the Court stressed the fee ownership of the allotted Chippewa lands held in trust by the United States for the allottees. No argument is advanced by the Government concerning its reversionary interest and we see no relevance in it to our issues. As to the fiduciary interest asserted by the United States, Minnesota v. United States, supra, is distinguished on other grounds in the discussion below
 
 
 [11]
 This latter restraint was alleged in the Government's complaint and admitted in the City's answer. The Government's brief on appeal cites the allegation of this restraint in the complaint, and we read the Government's arguments premised on restraints on alienation to refer both to the restraint in the patent and that in the Non-Intercourse Act. As explained below, we are satisfied that both restraints were removed by the special statutes and agreements dealing with the Choctaw and Chickasaw Nations
 
 
 [12]
 The Atoka Agreement was reaffirmed by the Supplemental Agreement, Act of July 1, 1902, 32 Stat. 641. The Supplemental Agreement was signed on March 21, 1902; ratified by Congress on July 1, 1902; and became effective when ratified by the Nations on September 25, 1902
 
 
 [13]
 Zevely v. Weimer, 82 S.W. 941, 947 (Ct.App.Ind.T.1904), Aff'd, 138 F. 1006 (8th Cir.); See Morris v. Hitchcock, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030; Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183; Cf. Buster v. Wright, 135 F. 947 (8th Cir.) (Curtis Act gave consent of U.S. for sale of town lots); See generally Stephens v. Cherokee Nation, 174 U.S. 445, 19 S.Ct. 722, 43 L.Ed. 1041. The Atoka Agreement was not effective until August 24, 1898, the date of its ratification by the Nations
 
 
 [14]
 Relevant portions of the Curtis Act are reproduced at greater length in the Appendix to this opinion
 
 
 [15]
 While some agreements concerning tribal conveyances of allotments required the Secretary's approval of the patent to the allottee, no such approval was required in the Choctaw and Chickasaw agreements. In re Five Civilized Tribes, 199 F. 811, 819 (E.D.Okl.); Bledsoe, Indian Land Laws, Secs. 32, 74 (2d ed. 1913); Mills, Oklahoma Indian Land Laws, Sec. 61 (2d ed. 1924). Such patents were, however, given such approval, as Mills points out
 In Sec. 74 Bledsoe states that it is doubtful if the Secretary's approval of the Choctaw and Chickasaw patents was either necessary or effectual to accomplish anything, and that if necessary to the validity of the patent, it makes the same effectual as of the date of their execution.
 On the other hand, we note that in other parts of the Curtis Act there were conditions imposed for governmental approvals and participation in transactions involving tribal lands. In Sec. 13, 30 Stat. at 498, (see Appendix hereto), it was provided that the Secretary of the Interior was authorized to make regulations for leasing of oil, coal, asphalt and other minerals in the Territory and that all such leases should be made by the Secretary, and that any lease otherwise made was void.
 In Sec. 15 of the Curtis Act, 30 Stat. at 500, appraisal of town lots by commissions was authorized, and no such appraisal was effective until approved by the Secretary, and in case of disagreement by members of such commission on the value of any lot, the Secretary was authorized to fix the value.
 Again in Sec. 15, 30 Stat. at 501, it was provided that unimproved town lots might be sold, but not for less than their appraised value, unless ordered by the Secretary.
 These provisions demonstrate that statutory requirements for further governmental approvals were expressly provided where desired by Congress, but this was not done with respect to such condemnation proceedings under Sec. 11. Hence, as to condemnation, the congressional choice that the proceedings in the United States Court for the Territory were the only required step seems clear.
 
 
 [16]
 Sec. 2 of the Curtis Act provided as follows (30 Stat. 495):
 Sec. 2. That when in the progress of any civil suit, either in law or equity, pending in the United States court in any district in said Territory, it shall appear to the court that the property of any tribe is in any way affected by the issues being heard, said court is hereby authorized and required to make said tribe a party to said suit by service upon the chief or governor of the tribe, and the suit shall thereafter be conducted and determined as if said tribe had been an original party to said action.
 
 
 [17]
 Statutory restraints on the alienation of unallotted Choctaw and Chickasaw tribal lands were reimposed by Section 16 of the Act of April 26, 1906, 34 Stat. 137, 143, which directed the Secretary of the Interior to sell such lands under rules and regulations to be prescribed by him. The proceeds of such sales were ordered to be deposited in the United States Treasury to the credit of the respective tribes. See also id. at 148 (tribal lands to be held in trust). These restraints, however, did not stand as a bar to the 1903 condemnation proceedings carried out in this case under the procedures specified by Sec. 11 of the Curtis Act
 Other statutory provisions in force in January 1903 imposed restraints on the alienation of allottees' lands, E. g., Supplemental Agreement, 32 Stat. 641, 643; Atoka Agreement, 30 Stat. 505, 507, but they are not relevant here.
 
 
 [18]
 Concerning the legislative history, the Government argues first that the House Report accompanying the Curtis Bill described only a consent to the sale of tribal property within the limits of an incorporated town. H.Rep. No. 593, at 3, 55th Cong., 2d Sess. (1898). This argument is based on the claim that section eleven was not part of the bill reported on by the House but was added as an amendment by the Senate. This contention is incorrect because the bill, as passed by the House and introduced in the Senate, contained section eleven. 31 Cong.Rec. 3870 (1898); See 31 Cong.Rec. 5552 (1898). Furthermore, in light of the purposes of the Curtis Bill and its structure, it would have been a meaningless piece of legislation without section eleven. If the Government means to say that the specific proviso of section eleven relied on by the City was not in the House bill but was added by the Senate, that argument, too, is unfounded. There was an amendment of the section eleven condemnation proviso on the Senate floor, but it merely added the words "heretofore incorporated or."
 Contrary to the argument advanced by the Government, we do not read the language of H.Rep. No. 593, at 3, 55th Cong., 2d Sess. (1898), as language restricting the condemnation authority of the towns in Indian Territory. The Atoka Agreement itself provided that townsites "be restricted as far as possible to their present limits." 30 Stat. at 508. This was not an absolute limitation but a flexible formulation. See Indian Appropriations Act for 1900, 31 Stat. 221, 238; Supplemental Agreement, Sec. 45, 32 Stat. 641, 652 (ratifying townsite limit provisions of 1901 Appropriation Act). Finally, we observe that the relevant sections of Mansfield's Digest nowhere confine a municipality's condemnation authority to its corporate limits.
 The Government also argues for a restricted view of the scope of the section eleven condemnation authority based on Congressional failure to act a refusal to authorize condemnations for railroad rights of way and the non-passage of S. 3720 Authorizing Cities and Towns in Indian Territory to Secure by Condemnation or Otherwise Lands Necessary for Public Improvements. The simple answer to these arguments is that S. 3720 never passed because the objects of the legislation were secured by section eleven of the Curtis Act, and the railroads received broad condemnation authority in the Act of February 28, 1902, 32 Stat. 43, 47.
 Thus, although the legislative history of section eleven reveals little about the intended scope of the condemnation authority contained therein, it clearly does not support the negative inferences advanced by the Government.
 
 
 [19]
 Section 14 of the Curtis Act provides in part (30 Stat. at 500):
 . . . Such city or town governments shall in no case have any authority to impose upon or levy any tax against any lands in said cities or towns Until after title is secured from the tribe. (emphasis added).
 
 
 [20]
 As noted earlier, in the 1903 case it was agreed that fair compensation was $6,515.00, which was the value of the lands as appraised by the Dawes Commission. A verdict was returned in that amount
 
 
 [21]
 For example, the first tract is described as the "N 1/2 of NW 1/2 of . . . Sec. 30 . . . T6N R15E . . .," with the figure "80" appearing under the heading "Acres."
 In connection with the 1903 condemnation judgment, we note also that the judgment stated that it was agreed that the value of the lands sought to be condemned and described in the petition was in accordance with the appraisement made for the purpose of allotment by the Dawes Commission and was $6,515. (II R. 117).
 We take judicial notice of the fact that appraisals conducted by the Dawes Commission were statutorily required to reflect the value of the fee simple, excluding the improvements. E. g., 30 Stat. at 500, 506; Sen.Doc.No.65, 55th Cong., 2d Sess. (1898).
 
 
 *
 Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 § 1345:
 Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.
 
 
 [2]
 Before us, McAlester argues that the United States, by refusing to be joined in that action, is bound by the judgment therein. On similar facts, Choctaw and Chickasaw Nations v. Seitz, 193 F.2d 456 (10th Cir. 1951), Cert. denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952), this court held, "By reason of its guardianship and its governmental interest in such lands, the United States would not be bound by a judgment in this action, unless it became a party thereto." 193 F.2d at 458. See also, Sunderland v. United States, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259 (1924). Moreover, in introducing the 1952 judgment at trial in the present case, counsel for McAlester stated: "I don't offer it as an estoppel or anything like that * * * " Transcript at 11. McAlester's argument on this point is without support in the record or in judicial precedent, and the United States is not bound by the 1952 judgment
 
 
 [3]
 Also in 1970, the United States brought an action, United States v. Browning, Civil No. 69-214 (E.D.Okl. Feb. 9, 1971), to quiet title to about five acres of the same tribal lands involved here, which McAlester had attempted to convey to a third party. The court declared the Choctaw-Chickasaw Nations the owners of the unallotted five acres and quieted title in them
 
 
 [4]
 The district court admitted, over McAlester's objection, an affidavit submitted by the United States and purporting to establish that a search of the Archives disclosed no reference to the 1903 proceedings. We voice neither agreement nor disagreement with the trial court's admission of the affidavit, but merely note the court's statement in Atoka that "(t)he fact that the process or other papers are missing from the files will not overcome the presumption of jurisdiction," a statement particularly applicable where, as here, the judgment is 74 years old; the papers would have been under the custody of several persons and agencies; and the judgment arose in a period when modern-day conveniences of record-keeping were non-existent
 
 
 [5]
 The problem of water reservoirs in Indian Territory was specifically raised at the same time through introduction of Senate bill S.3720, 55th Cong., 2d Sess. (1898), which would have enabled cities and towns to construct waterworks for their communities with power to condemn sufficient Indian land for that purpose. That bill was referred to the Senate Committee on Indian Affairs. 31 Cong.Rec. 1756 (1898). S.Rep. No. 696, 55th Cong., 2d Sess. (1898), recommended passage. The bill was passed by the Senate on March 30, 1898, 31 Cong.Rec. 3350 (1898) and referred to the House Committee on Indian Affairs, 31 Cong.Rec. 3445 (1898), which recommended passage. H.R.Rep. No. 1278, 55th Cong., 2d Sess. (1898). The bill was neither passed in the House nor further discussed
 
 
 [6]
 Congress had provided by statute that the tribal governments were to expire on March 4, 1906. Act of March 3, 1903, ch. 994, § 8, 32 Stat. 1008. As that date approached, however, Congress, by joint resolution, extended the existence of the Five Tribes. Res. 7 of March 2, 1906, 34 Stat. 822. Finally, by the Act of May 27, 1908, ch. 199, 35 Stat. 312, Congress provided "(f)or the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes." See Seminole Nation of Oklahoma v. United States, 498 F.2d 1368, 204 Ct.Cl. 655 (1974), Cert. denied 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837 (1975)
 
 
 [7]
 We do not interpret the relief here sought by the United States as being so broad as to deprive McAlester of its source of water. We decide the case on legal principles, leaving to the district court the initial resolution of equities and the design of appropriate remedies